**In re SALT CREEK FREIGHTWAYS, a Wyoming corporation, Debtor.**

**Bankruptcy No. 85–00065–B.**

United States Bankruptcy Court, D. Wyoming.

Feb. 11, 1985.

Georg Jensen, Cheyenne, Wyo., Doris M. Poppler, Poppler & Vannoy, Billings, Mont., for petitioner/debtor.

Benjamin W. Hilley, Great Falls, Mont., for respondent.

## MEMORANDUM

HAROLD L. MAI, Bankruptcy Judge.

THIS MATTER came before the court on February 6, 1985 on the debtor's motion to implement interim changes in the terms of a collective bargaining agreement.

## CASE SUMMARY

In this case the court is called upon to decide whether to grant interim relief to the debtor-in-possession in accordance with 11 U.S.C. § 1113(e). For the reasons set forth herein, the court determines that such relief is proper.

## JURISDICTION

The court has jurisdiction over the parties and subject matter of this action under 28 U.S.C. § 1334, and the General Order of Reference of the United States District Court for the District of Wyoming dated July 19, 1984, entered pursuant to 28 U.S.C. § 157.

## FINDINGS OF FACT

Based on the testimony and documentary evidence introduced at the hearing on this matter, the court determines the facts as follows:

1. The debtor filed a voluntary Chapter 11 petition on January 23, 1985;

2. The debtor is engaged in the motor carrier industry. It is the principal general commodities carrier for Wyoming, has extensive operations in Montana and, additionally, conducts business in Washington, Idaho, Utah, Colorado, South Dakota, and Minnesota. The debtor employs approximately 350 people in eight (8) different states;

3. Approximately 250 of the debtor's employees are covered by a collective bargaining agreement with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America (hereinafter the Union). The collective bargaining agreement consists of the Union's Master Freight Agreement, an industry-wide contract, which is modified by a supplemental agreement with the individual Locals. The current contract runs out on March 31, 1985;

4. Subsequent to filing Chapter 11, the debtor informed the Union that it wished to begin negotiations to modify its contract. The debtor and the Union have engaged in two bargaining sessions in the past week. The company has submitted a proposal and the Union has submitted a counter-proposal. Both proposals contemplate substantial reductions in wages and benefits, but agreement over a new contract is not imminent. The debtor has not filed an application seeking rejection of the collective bargaining agreement;

5. The debtor's operations have lost money since 1979. In 1984, the debtor lost $1,752,329. The loss in the month of December of 1984 was $333,683, and in January of 1985 it was $338,280. Estimates

show that the loss will continue at the rate of over $330,000 a month throughout 1985;

6. In response to its continuing financial distress, the debtor has made the following changes in the employment conditions of its management and other non-union employees: (1) the company has discontinued such former "perks" of management as the payment of club dues; (2) company cars and car allowances have been discontinued; (3) it has reduced supervisory and management personnel, i.e., the officers and directors of the corporation have been reduced from 11 in number to two (2); (4) vacation time for management has been restricted to a maximum of two (2) weeks; (5) changes in the insurance coverage for non-union employees has increased the deductible and percentage payable by employees; (6) it has discontinued the pension program for all non-union employees; and (7) effective February 11, 1985, the salaries of all non-union personnel will be cut;

7. In the past three (3) years, both the union and non-union employees of the debtor have participated in various voluntary wage deferral programs which have allowed the debtor to defer the payment of over two million dollars in wages;

8. The debtor's current operating ratio, or percentage of expenses to revenue, is currently 117%. The proposed interim changes in the contract, plus the wage cuts to all non-union employees, would reduce that ratio to 95.4%;

9. The debtor will be unable to remain in business more than one (1) week if the interim changes are not authorized.

### CONCLUSIONS OF LAW

The treatment of collective bargaining agreements in Chapter 11 is an area that has generated much debate in recent years.[1] The Supreme Court's decision last year in *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. ——, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), intensified this controversy. As a result, the rejection of collective bargaining agreements is no longer governed by Section 365 of the Bankruptcy Code, but is now governed by a new Section 1113, added to the Code by the Bankruptcy Amendments and Federal Judgeship Act of 1984. The new Section 1113 proscribes the procedures and standards for the rejection of collective bargaining agreements. Congress incorporated into subsection (e) of this new Section a provision recommended by the National Bankruptcy Conference, which would allow for the implementation of interim changes in a collective bargaining agreement. Subsection (e) provides,

If during a period when the collective bargaining agreement continues in effect, and if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate, the court, after notice and a hearing, may authorize the trustee to implement interim changes in the terms, conditions, wages, benefits, or work rules provided by a collective bargaining agreement. Any hearing under this paragraph shall be scheduled in accordance with the needs of the trustee. The implementation of such interim changes shall not render the application for rejection moot.

Thus, interim changes may only be authorized "if essential to the continuation of the debtor's business." The legislative history indicates that the standard for authorizing such interim changes is the *REA Express* standard for rejection of collective bargaining agreements. 130 Cong. Rec. H7496 (daily ed. June 29, 1984) (remarks of Representatives Morrisen and Lungren); 130 Cong.Rec. S8898 (daily ed. June 19, 1984) (remarks of Senator Packwood). This standard was developed by the Second Circuit in the case of *Brother-*

---

**1.** *See, e.g.,* Rosenberg "Bankruptcy in the Collective Bargaining Agreement—a Brief Lesson in the Use of the Constitutional System of Checks and Balances," 58 Am.Bankr.L.J. 293 (1984); Gibson, "The New Law on Rejection of Collective Bargaining Agreements in Chapter 11: an Analysis of 11 U.S.C. § 1113," 58 Am.Bankr.L.J. 325 (1984); Bordewieck & Countryman, "The Rejection of Collective Bargaining Agreements by Chapter 11 Debtors," 57 Am.Bankr.L.J. 293 (1983).

*hood of Railway Employees v. REA Express, Inc.*, 523 F.2d 164, *cert. denied*, 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975).

As stated by the Second Circuit, the *REA Express* standard is

"... in view of the serious effects which rejection has on the carrier's employees it should be authorized only where it clearly appears to be the lesser of two evils and that, unless the agreement is rejected, the carrier will collapse and the employees will not longer have their jobs." 523 F.2d at 172.

This very strict standard was rejected by the Supreme Court in the *Bildisco* case. 104 S.Ct. at 1196. Significantly, the *REA Express* standard that Congress has adopted for the authorization of interim relief pursuant to subsection (e), is a more strict standard than the "balance of the equities" standard adopted for an application to reject a collective bargaining agreement. *See* 11 U.S.C. § 1113(c)(3). Thus, a debtor seeking interim relief must show a more immediate level of economic emergency than it would need to show as support for an application for rejection.

The Union urges this court to adopt the nine-part test, set forth in the case of *In re American Provision Co.*, 44 B.R. 907, 118 LLRM 2059, 12 B.C.D. 558 (Bkcy.D.Minn. 1984), as the standard for authorizing interim changes under subsection (e). The *American Provision* case, however, does not address subsection (e). Rather, it sets forth the nine requirements for court approval of the rejection of collective bargaining agreements under Section 1113. As discussed above, the standard for the rejection of collective bargaining agreements is separate and distinct from the standard for the authorization of interim changes under subsection (e). Thus, the nine-part *American Provision* test is not applicable to a determination of whether to authorize the debtor-in-possession to make interim changes under Section 1113(e).

■ Applying the *REA Express* standard in the context of subsection (e), it appears that the interim changes may only be authorized if the evidence establishes that, without such changes, the company will collapse and the employees will no longer have their jobs.

Reviewing the record in this case, the debtor introduced documentary evidence showing the losses and asset depletion suffered by the company over the past few years. The debtor submitted schedules showing the comparison effects of labor costs with and without the proposed interim changes. Mr. Trimmer, the president and chief executive officer of the company, testified on the causes of the company's financial distress and its projected 1985 income. Finally, Mr. Trimmer testified that, without the requested interim changes, the company will not be able to stay in business longer than one (1) week.

■ The Union, on the other hand, did not dispute the testimony of Mr. Trimmer that the company would be unable to continue in business more than one week without the interim changes. The Union did not introduce any testimony or documentary evidence to show that the debtor had any options available which would allow it to stay in business without the proposed interim changes. In view of such uncontradicted evidence, the court must find that the debtor has met his burden of establishing that the interim changes are essential to the continuation of the debtor's business.

■ It is the position of the Union that the phrase "during a period when the collective bargaining agreement continues in effect" in subsection (e), refers only to the period following an unsuccessful attempt at rejection. Thus, the Union argues that debtor may not request such changes until he has unsuccessfully attempted rejection of the collective bargaining agreement. This court does not agree. The plain language of the statute does not contain any such limitation. Rather, it refers simply to "a" period when the bargaining agreement remains in effect. The word "a" means one or any. BLACK'S LAW DICTIONARY 1 (rev. 5th ed. 1979). Nothing in the

context of the use of the word "a" indicates that it is intended to mean something more specific that any one of the various times in which a collective bargaining agreement remains in effect. 2A C. Sands, SUTHERLAND ON STATUTORY CONSTRUCTION § 47.34, at 249 (rev. 4th ed. 1984).

Section 1113(b) requires that subsequent to filing, but before seeking rejection, the debtor must meet and confer in good faith with the union over the debtor's proposed modifications. There is no time frame specified for such negotiations. The period during which such negotiations continue is undeniably "a period" during which the collective bargaining agreement remains in effect. Similarly, the time during which a court is considering an application for rejection and the time following an unsuccessful attempt at rejection are, also, each, "a period" during which the collective bargaining agreement continues in effect.

The inclusion of the interim changes provision was a compromise by which Congress intended that a court would have the flexibility to effectuate the overriding objective of Chapter 11, the preservation of a failing business for the benefit of all, including the employees who would otherwise lose their jobs. 130 Cong.Rec. H7495 (daily ed. June 29, 1984) (remarks of Representative Lungren), 130 Cong.Rec. S8888 (daily ed. June 29, 1984) (remarks of Senator Thurman) and S8892 (remarks of Senator Hatch).

On this issue, the legislative history is not clear as to the interpretation of "a period".[2] It is the opinion of this court that the purpose of the inclusion of the interim changes provision of subsection (e) would be thwarted if limited to the period of time after the unsuccessful attempt at rejection. The present case is a graphic illustration of this point. The debtor and the Union are just beginning to negotiate as required by Section 1113(b). If the debtor is not granted immediate interim relief,

it will be out of business in a week, mooting the attempts at negotiation for contract modifications that could well save its business.

■ Mr. Trimmer testified that the interim changes that the debtor was asking for in the collective bargaining contract were economic relief in six (6) specific areas. These areas are: reduction in the wage rates, elimination of payments to the health and welfare fund, elimination of payments to the pension fund, the elimination of sick leave payments, reduction in the number of paid holidays to six, and a reduction in paid vacation.

The testimony revealed that the debtor's proposal (exhibit C of the debtor's motion for interim changes) contained proposed changes other than the six testified to. There is no evidence before the court that those other changes, referred to as "non-economic" by the parties, are necessary for the continuation of the debtor's business. Therefore, the court will grant the debtor's application and will authorize the debtor to implement interim changes, in the six (6) specific areas listed above, in the collective bargaining agreement.

The debtor is authorized to make these interim changes until March 31, 1985, or until a new collective bargaining agreement is negotiated with the Union, whichever first occurs.

■ The court cautions the parties that its ruling today, authorizing the debtor-in-possession to implement interim changes in the collective bargaining agreement, does not, in any manner, relieve them of their responsibility under § 1113(b) to continue to bargain in good faith towards reaching modification of the agreement. Additionally, the court would note that under Section 1113(e), the authorization of interim changes does not render moot the issues ultimately to be decided on an application for rejection of the collective bargaining agreement.

---

**2.** *Compare* 130 Cong.Rec. S8899 (daily ed. June 29, 1984) (joint statement of Representatives Hughes and Morrison printed at request of Senator Kennedy) *with* 130 Cong.Rec. S8892 (daily ed. June 29, 1984) (remarks of Senator Hatch).

Counsel for the debtor-in-possession is directed to prepare and submit an order consistent with this memorandum opinion.