### In re IONOSPHERE CLUBS, INC. and Eastern Airlines, Inc., Debtors.

### Martin R. SHUGRUE, Jr., Trustee for the Estate of Eastern Air Lines, Inc., Plaintiff–Appellee,

### v.

### AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Charles H. Copeland and Jack N. Mogus, Defendants–Appellants.

### No. 90 Civ. 6706 (RJW).

United States District Court, S.D. New York.

April 6, 1992.

---

Weil, Gotshall & Manges, New York City (Bruce R. Zirinsky, Laura M. Sillins, Matthew A. Cantor, of counsel), Verner, Liipfert, Bernhard, McPherson and Hand, Chartered, Washington, D.C. (Joseph L. Manson, of counsel), for appellee.

Cohen, Weiss & Simon, Richard M. Seltzer, Mary T. Connelly, New York City, for appellants.

## OPINION

ROBERT J. WARD, District Judge.

Appellants Air Line Pilots Association, International ("ALPA"), Charles H. Copeland and Jack N. Mogus appeal from an order of the United States Bankruptcy Court for the Southern District of New York (Lifland, C.B.J.), entered August 14, 1990, as amended on September 13, 1990. The order (1) granted appellee Martin R. Shugrue (the "Trustee"), Trustee for the Estate of Eastern Airlines, Inc. ("Eastern") relief, pursuant to section 1113(e) of Title 11, United States Code (the "Bankruptcy Code"), from certain provisions of the Collective Bargaining Agreement ("CBA") adopted by Eastern and ALPA in February 1986, and (2) preliminarily enjoined appellants, pursuant to section 105(a) of the Bankruptcy Code, from prosecuting two actions against Eastern commenced in the United States District Court for the Southern District of Florida.

For the reasons that follow, the order of the bankruptcy court is vacated and the matter is remanded.

## BACKGROUND

ALPA is an unincorporated labor organization and the authorized collective bargaining representative under the Railway Labor Act, 45 U.S.C. § 151 et seq. ("RLA"), for all airline pilots employed by Eastern. Prior to its institution of the instant bankruptcy proceedings, Eastern was a corporation engaged in the business of providing air transportation service in interstate and foreign commerce and was a "carrier" subject to the RLA.[1]

---

1. Following the bankruptcy court's decision, but prior to the determination of this appeal, the

At all times relevant to this litigation, the relationship between Eastern and ALPA was governed by the CBA.[2] Under the CBA, contractual grievances were subject to arbitration before the ALPA–Eastern System Board of Adjustment (the "System Board"). Similarly, disputes regarding pension rights were subject to arbitration before the ALPA–Eastern Pension Dispute Board (the "Pension Board"). According to ALPA, these arbitration procedures were not only mandated by the CBA, but were also required under the RLA and, in the case of the Pension Board, by the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*

On March 4, 1989, the International Association of Machinists and Aerospace Workers ("IAM") began a primary strike against Eastern. ALPA honored the IAM picket lines and engaged in a sympathy strike. On March 9, 1989, Eastern and its affiliate, Ionosphere Clubs, Inc., filed a petition for reorganization under Chapter 11 of the Bankruptcy Code.

### A. *Eastern's Efforts to Modify the CBA*

In June 1989, Eastern filed an application to reject the CBA pursuant to section 1113 of the Bankruptcy Code. Section 1113 permits a debtor to modify or reject a collective bargaining agreement under certain circumstances. After ALPA invoked the mediation services of the National Mediation Board ("NMB"), pursuant to section 5 of the RLA, 45 U.S.C. § 155, Eastern withdrew this first § 1113 application.

Eastern filed a second § 1113 application in April 1990, which was adjourned following the appointment of the Trustee later that same month. On July 9, 1990, the NMB terminated its mediation efforts and issued a proffer of arbitration to Eastern and ALPA, pursuant to section 5, First of the RLA, requesting that the parties submit their dispute to binding interest arbitration. ALPA accepted, but Eastern rejected

the proffer of arbitration. This rejection triggered the RLA's statutory cooling-off period, after which Eastern would have been entitled to unilaterally implement changes to the terms of the CBA. 45 U.S.C. § 155, First. The Trustee subsequently withdrew the pending motion to reject the CBA.

On July 19, 1990 ALPA filed a lawsuit in the United States District Court for the Southern District of Florida, seeking an injunction preventing Eastern from implementing any unilateral changes to the CBA and directing Eastern to bargain in good faith with ALPA (the "Bad Faith Lawsuit").

### B. *The Grievance Arbitration Dispute*

Eastern notified ALPA on January 12, 1990 that it considered all efforts to prosecute grievances and pension disputes to be in violation of the automatic stay of the Bankruptcy Code, 11 U.S.C. § 362. It advised ALPA that Eastern would no longer participate in the System Board or the Pension Board, except for those grievances and pension disputes it consented to arbitrate. Eastern notified ALPA that it would be willing to resolve certain grievances that would not be burdensome to Eastern's Chapter 11 estate or that would involve only de minimis monetary recoveries. Only those grievances that Eastern has agreed to process have subsequently gone forward before the Boards.

Appellants commenced an action against Eastern and certain Eastern employees on or about July 9, 1990, in the United States District Court for the Southern District of Florida, seeking to enjoin Eastern from refusing to participate in the operation of the System Board and the Pension Board (the "Grievance Lawsuit"). (The Bad Faith Lawsuit and the Grievance Lawsuit are collectively referred to as the "Florida Lawsuits.")

bankruptcy proceedings were converted from a reorganization to liquidation and Eastern subsequently ceased operations.

**2.** Although the CBA expired by its terms on July 1, 1988, under the RLA, Eastern and ALPA were

required to maintain the status quo. Eastern and ALPA engaged in collective bargaining concerning changes to the CBA beginning in May 1988, but failed to reach an agreement.

### C. *Procedural History of this Appeal*

On or about August 1, 1990, the Trustee commenced an adversary proceeding in the bankruptcy court, seeking a declaratory judgment that the CBA was no longer in effect as of August 10, 1990 and that the Trustee was authorized to make unilateral changes to the CBA beginning on August 11, 1990. Alternatively, the Trustee seeks an order authorizing him to reject the CBA in accordance with section 1113(a) of the Bankruptcy Code. The complaint also requests a ruling that the Florida Lawsuits were commenced in violation of the automatic stay and an order enjoining appellants from continuing to prosecute the Florida Lawsuits and from commencing any other action against appellees in any court or forum other than the bankruptcy court. In addition, the complaint seeks an order directing that ALPA and any individual pilots with grievances or pension disputes file any claims against Eastern with the bankruptcy court or forfeit those claims.

Contemporaneous with the commencement of the adversary proceeding, the Trustee filed a motion seeking preliminary relief in the form of (1) an order authorizing the Trustee to implement certain wage, work rule and other changes to the CBA on an interim basis pursuant to section 1113(e) of the Bankruptcy Code and (2) a temporary restraining order and preliminary injunction enjoining appellants from proceeding with the Florida Lawsuits pending a determination of the merits of the adversary proceeding in the bankruptcy court.

On August 1, 1990, the bankruptcy court granted a temporary restraining order enjoining appellants from proceeding with the Florida Lawsuits and set a hearing date for the motion. On August 7, 1990, Bankruptcy Judge Blackshear denied ALPA's motion for a stay of the temporary restraining order pending appeal. Subsequently, on August 8, 1990, Judge Miner of the Court of Appeals for the Second Circuit denied ALPA's petition for a stay of the order pending appeal.

The hearing on the Trustee's motion was held on August 13 and 14, 1990. At the hearing, ALPA objected to the proposed modifications to the CBA, stating that they did not constitute the type of emergency, temporary relief contemplated by section 1113(e). After hearing testimony from the Trustee and two Eastern officials, Judge Lifland ruled from the bench, granting the Trustee's motion in all respects. That same day, the bankruptcy judge issued a written decision and an order and judgment authorizing implementation of interim modifications to the CBA and issuing a preliminary injunction pursuant to § 105(a) of the Bankruptcy Code. Decision on Motions Pursuant to § 1113(e) ("Decision") and Order and Judgment ("Order"), both dated August 14, 1990. The bankruptcy court found that the Trustee's proposed modifications of the CBA were necessary to avoid irreparable harm to Eastern's estate and that the Bad Faith Lawsuit would, if successful, prevent Eastern from making those changes. Decision at 13. The bankruptcy court also concluded that a preliminary injunction enjoining the Grievance Lawsuit was warranted because a decision in the adversary proceeding might render that action moot. *Id.* at 14–15.

Following the granting of his motion, the Trustee moved, on September 10, 1990, for certain changes to the order permitting the interim modifications to the CBA. The Trustee requested, *inter alia*, that the pilots' wages, which had been substantially reduced under the bankruptcy court's order, be raised somewhat so as to spread out savings from wage reductions over a longer period of time. In support of this second motion, the Trustee submitted evidence that the wage reductions had produced bitter complaints among the working pilots and that many had threatened to quit the company as a result. At the hearing on the motion, ALPA renewed its objection that interim modifications to the CBA authorized by the bankruptcy court do not conform to the requirements of § 1113(e). On September 14, 1990, the bankruptcy court amended the Order to incorporate the changes requested by the Trustee. This appeal followed.

#### D. *Issues on Appeal*

Appellants raise a host of issues on this appeal, many of which do not appear to have been argued before the bankruptcy court. The following three issues are appropriately addressed by this Court and are necessary to deciding this appeal:

1. Whether the order issued by the bankruptcy court is a final order which the parties may appeal as of right, and, if the order is not final, whether this Court should grant ALPA leave to bring this appeal?

2. Whether the bankruptcy court complied with the procedural and substantive requirements of section 1113 of the Bankruptcy Code when it issued the order pursuant to § 1113(e) authorizing interim modifications to the CBA?

3. Whether the preliminary injunctions contained in the bankruptcy court's order, prohibiting ALPA from prosecuting the Florida Lawsuits, were permitted by the Bankruptcy Code and other applicable law?

### DISCUSSION

#### I. Appellate Jurisdiction

Under 28 U.S.C. § 158(a), the parties to a proceeding in bankruptcy may appeal as of right from final judgments, orders and decrees, and, in addition, a district court may grant the parties permission to appeal from an interlocutory order of a bankruptcy court.[3] The Trustee contends that there is no right to appeal that portion of the bankruptcy court's order made pursuant to § 1113(e), since the relief granted under that section of the Bankruptcy Code is by its terms interim. The Trustee further contends that this Court should not grant leave to appeal the order. ALPA maintains that the order authorizing interim modifications to the CBA is effectively a final order of the bankruptcy court, since it is either permanent or of indefinite duration. In addition, while neither party contests the Court's jurisdiction to hear the appeal of the preliminary injunctions, the Court must

determine whether the appeal is permissive or as of right. *See In re Lomas Financial Corp.*, 932 F.2d 147, 151 (2d Cir.1991) (remanding affirmance of bankruptcy court where district court made no determination regarding finality of order).

#### A. *The § 1113(e) Modifications to the CBA*

The modifications to the CBA contained in the bankruptcy court's order were issued pursuant to § 1113(e) of the Bankruptcy Code, which provides for "interim changes in the terms ... [of] a collective bargaining agreement." Although the words of the statute as well as the language of the bankruptcy court's order both provide that the changes authorized pursuant to § 1113(e) are temporary, ALPA argues that the bankruptcy court's order constitutes a final order as regards the § 1113(e) modifications. In support of its contention, ALPA points out that the order is of unlimited duration and that the order was issued when there was no pending application for permanent modification or rejection of the CBA. ALPA's position with respect to appealability is related to its argument on the merits of this appeal, since ALPA contends among other things that the bankruptcy court circumvented the procedures mandated by § 1113 when it authorized relief of an unlimited duration under § 1113(e).

Because bankruptcy proceedings often continue for long periods of time, and discrete claims within those proceedings are frequently resolved prior to the conclusion of the entire bankruptcy, the concept of finality in bankruptcy matters is more flexible than in ordinary civil litigation. *In re Chateaugay Corp.*, 880 F.2d 1509, 1511 (2d Cir.1989). Thus, orders of a bankruptcy court that "finally dispose of discrete disputes within the larger case" are considered final for purposes of a bankruptcy appeal. *In re Johns–Manville Corp.*, 824 F.2d 176, 179 (2d Cir.1987) (emphasis omitted) (quoting *In re Saco Local Develop-*

---

**3.** Section 158(a) provides, in pertinent part: "The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees, and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges ..."

*ment Corp.*, 711 F.2d 441, 444 (1st Cir. 1983)).

■ An order authorizing permanent changes to or rejection of a collective bargaining agreement is clearly regarded by the courts as a final order in the context of bankruptcy proceedings. *Truck Drivers Local 807, Int'l Bhd. of Teamsters v. Carey Transportation Inc.*, 816 F.2d 82 (2d Cir.1987); *In re Century Brass Products, Inc.*, 795 F.2d 265 (2d Cir.), *cert. denied*, 479 U.S. 949, 107 S.Ct. 433, 93 L.Ed.2d 383 (1986). Here, while the bankruptcy court characterized the § 1113(e) order as interim, the order is of indefinite duration. Indeed, the bankruptcy court cited savings to Eastern over the next two years in support of implementing the § 1113(e) modifications.[4] *See* discussion in Section II.B. below. The Court therefore concludes that the portion of the bankruptcy court's order authorizing § 1113(e) modifications was final and appealable as of right.

### B. *The Preliminary Injunctions*

■ The bankruptcy court described the injunctions at issue in this appeal as "preliminary," and stated that the injunctions were intended to remain in force "pending the court's determination of the Complaint [in the adversary proceeding]." Order at 7–8.

Normally, the issuance of a preliminary injunction is followed by a hearing on a permanent injunction. However, in some circumstances a plaintiff seeks injunctive relief that is preliminary only in the sense that it allows a proceeding to go forward in another forum. *See Manning v. Energy Conversion Devices, Inc.*, 833 F.2d 1096,

1100 (2d Cir.1987) (injunction prohibiting shareholders' meeting pending arbitration). In such circumstances, the injunction has been said to be a "final injunction … of limited duration." *Id.* at 1101. In the bankruptcy context, the Second Circuit has recently clarified its view that where the bankruptcy court issues a "preliminary" injunction, but contemplates no further hearing on the merits of the injunction, apart from the outcome of the reorganization, the injunction is a final, appealable order. *In re Lomas Financial Corp., supra*, 932 F.2d at 151.

Here, it appears that the bankruptcy court intended that there be no further hearing on whether the Trustee is entitled to enjoin the Florida Lawsuits, apart from a determination of the merits of the adversary proceeding. Since the effect of the order is to preclude ALPA from making any further argument that the injunctions are not authorized under the Bankruptcy Code or other applicable law, and from proceeding further in the Florida Lawsuits, the Court concludes that the Order is sufficiently final so as to be appealable as of right as regards the injunctions.

### II. The Merits of the Modification to the CBA Pursuant to § 1113(e)

■ ALPA attacks the § 1113(e) modifications contained in the bankruptcy court's order on two grounds. First, ALPA claims that by issuing interim relief of unlimited duration when there was no application for permanent relief pending, the bankruptcy court effectively bypassed the procedures mandated in § 1113 and authorized permanent modifications to the CBA.[5] Second, the union contends that the

---

**4.** The Trustee cites *In re Landmark Hotel & Casino, Inc.*, 872 F.2d 857 (9th Cir.1989) for the proposition that an order of a bankruptcy court issued pursuant to § 1113(e) can never be considered a final order. In that case, however, an application for rejection of the collective bargaining agreement was pending at the time the bankruptcy court authorized interim changes pursuant to § 1113(e), the interim relief order was of limited duration, and an order authorizing rejection was ultimately issued. *Id.* at 858–59. Moreover, the Ninth Circuit appears to follow a more rigid rule regarding the finality of a bankruptcy court's orders than that applied in

this Circuit. The Court in that case stated that "[w]hen further proceedings in the bankruptcy court will affect the scope of an order, the order is not subject to review in this court." *Id.* at 860 (citation omitted). The Second Circuit, by contrast, has held an order which denied relief from the automatic stay for a minimum of one year to be final and appealable. *In re Chateaugay Corp.*, 880 F.2d 1509, 1512 (2d Cir.1989).

**5.** At oral argument, the Trustee raised for the first time the possibility that the complaint in the adversary proceeding could be deemed an application for rejection. Although the Court

bankruptcy court applied an incorrect standard in determining that interim relief was warranted.

### A. *The Procedural Requirements of § 1113*

ALPA argues that the language, structure and legislative history of § 1113 indicate that interim relief under § 1113(e) should be of a limited duration and granted only when an application for rejection is pending. The Trustee maintains that § 1113 contains no requirement that a debtor make an application for rejection in order to obtain temporary relief from the CBA under § 1113(e). Instead, the Trustee argues that so long as the bankruptcy court finds that modifications to the CBA are necessary in order to avoid "irreparable harm" to the bankruptcy estate, those modifications may be made pursuant to § 1113(e).

■ Section 1113 of the Bankruptcy Code provides a mandatory procedure to be followed by a debtor who seeks to reject or modify a collective bargaining agreement.[6] 11 U.S.C. § 1113(a). The debtor must first make a proposal to the union containing the modifications it believes are necessary to permit its reorganization. *Id.* § 1113(b)(1)(B). It may only file an application for rejection if the union rejects its proposal after a good faith effort to reach a mutually satisfactory modification. *Id.* § 1113(b)(2). The bankruptcy court may authorize the rejection if it finds that the union has refused the proposed modifications without good cause and the balance of equities favors rejection. *Id.* § 1113(c).

Section 1113 also mandates strict time periods to be followed by the bankruptcy court in considering an application for rejection. The hearing on the application for rejection must be held within 14 days of the filing of the application, unless the court extends the time for commencement of the hearing. The date for commencement of the hearing may not be extended for longer than 7 days unless both the trustee and the union agree. *Id.* § 1113(d)(1). The bankruptcy court is required to rule on the application within 30 days after the commencement of the hearing, unless the parties agree to extend the date of the ruling. *Id.* § 1113(d)(2).

ALPA argues that § 1113(e) must be read in the context of the procedural structure described above. According to ALPA, it would be unreasonable to read § 1113(e) as allowing the Trustee to make interim modifications to the CBA of an unlimited duration, given the extremely limited time periods to which an application for permanent relief is subject.

In addition, ALPA points to the language of the statute in support of its view that modifications under the CBA are not permitted unless an application for rejection is pending. The section states that "interim" changes may be authorized by the bankruptcy court, but "[t]he implementation of such interim changes shall not render the application for rejection moot." *Id.* § 1113(e). According to ALPA, this language only makes sense if an application for rejection is a prerequisite to obtaining interim relief.

■ ALPA further contends that its reading of § 1113(e) is the one intended by

agrees with the Trustee's contention that substance should prevail over form, an examination of the complaint reveals that it was never intended to constitute an application for rejection. The complaint contains no allegations that the procedural requirements for filing a rejection application have been met, nor does it state that such an application is pending. Rather, the complaint specifically states that no rejection application is before the bankruptcy court, and goes on to request "a prompt determination of whether the [CBA] continues in effect … in order that the Trustee may deter-

mine whether or not it is necessary to seek such relief from this court to reject the [CBA] pursuant to section 1113(a) of the Bankruptcy Code." Complaint at ¶ 27.

**6.** Section 1113 was enacted in response to the Supreme Court's decision in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), which held that a debtor may unilaterally terminate or modify a collective bargaining agreement without obtaining prior approval of the bankruptcy court.

Congress.[7] In support of the legislation, Representatives Morrison and Hughes issued a statement, which reads in part:

[A]s the final sentence of the subsection makes clear, a motion for such interim relief may only be made in conjunction with an application for rejection and any authorization shall be effective only for the period for considering and ruling on the application stated in subsection (d).

Congressional Record, reprinted in Appendix 4, *Collier on Bankruptcy*, XX–87 (15th ed. 1989).

Although the Second Circuit has never ruled on the meaning of § 1113(e), language in the Court's decisions interpreting other portions of § 1113 supports ALPA's view of the subsection. In *In re Century Brass Products, Inc., supra*, the Court noted the importance of the procedures outlined in § 1113 and pointed out that one of the law's sponsors stated that the subsection "places the primary focus on the private collective bargaining process and not in the courts," by requiring the employer to bargain in good faith with the union before seeking court approval for rejection. 795 F.2d at 273 (quoting statement of Senator Packwood, 130 Cong.Rec. S 8898 (daily ed. June 29 1984)). Allowing interim relief of unlimited duration under § 1113(e) would undermine this goal by enabling an employer to obtain the desired modifications to a collective bargaining agreement without ever engaging in the bargaining process required for permanent relief. Even more notable than the *Century Brass* decision is the Court of Appeals' discussion of the differences between interim relief requests and post-petition modification proposals in *Truck Drivers Local 807, Int'l Bhd. of Teamsters v. Carey Transportation Inc., supra*, 816 F.2d at 82: "Interim relief is available only until the hearing process is completed—normally within two months, *see* § 1113(d)(1), (2)."

In support of his position that relief under § 1113(e) may be granted regardless of whether an application for rejection has been filed, the Trustee cites *Beckley Coal Mining Co. v. United Mine Workers of America*, 98 B.R. 690 (D.Del.1988). In *Beckley*, a district court held that a pending rejection application was not a prerequisite to § 1113(e) relief, stating that such a reading of the subsection would deprive the bankruptcy court of "sufficient flexibility to provide the debtor in possession temporary economic relief ... to preserve the business, if possible, for the benefit of all." 98 B.R. at 694. The court pointed out the procedural hurdles that must be crossed before an application for rejection may be filed, and expressed concern that if § 1113(e) relief is conditioned on the filing of an application, it may not be available in just the sort of emergency situation for which the subsection was intended.

However legitimate the concerns raised by the court in *Beckley* may be, they are not at issue here. There was no danger of imminent liquidation at the time that Eastern filed its motion for interim relief. The Trustee testified at the § 1113 hearing that he was not prepared to say that the company would cease operation, even over the following 90 days, if the requested modifications to the CBA were not implemented. Hearing before Hon. Burton R. Lifland, August 13, 1990, transcript at 55–56, 61. Indeed, the fact that Eastern returned to the bankruptcy court a month after the original order was issued and asked that the wage reductions made pursuant to that order be modified to increase pilots' wages over the short term undermines the argument that there was a short term emergency that would preclude following the procedures outlined in § 1113.

Accordingly, without deciding whether § 1113(e) relief should ever be available prior to the filing of an application for permanent relief, the Court concludes that under the circumstances of this case, the granting of interim relief in the absence of an application for permanent relief was not warranted. Moreover, the structure of the

---

7. There are no committee reports accompanying the enactment of § 1113. Therefore, the Court must look to statements made by sponsors of the legislation on the floor of Congress for an expression of legislative intent. *Regents of the University of California v. Public Employment Relations Bd.*, 485 U.S. 589, 596–97, 108 S.Ct. 1404, 1409–10, 99 L.Ed.2d 664 (1988).

section, the legislative history and the statements of the Court of Appeals strongly suggest that interim relief granted pursuant to § 1113(e) should be of limited duration.

### B. *The Substantive · Requirements of § 1113(e)*

In addition to its argument regarding the procedural requirements of § 1113, ALPA contends that the bankruptcy court's order failed to comport with the substantive requirements for obtaining interim relief under § 1113(e). The subsection provides that interim relief from the provisions of the collective bargaining agreement may be granted "if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate." According to ALPA, this language incorporates the standard enunciated by the Second Circuit in *Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees, AFL–CIO v. REA Express, Inc.*, 523 F.2d 164 (2d Cir.), *cert. denied*, 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975). In that case, the Court held that a debtor was entitled to reject a collective bargaining agreement only when a court concluded that the agreement "will thwart efforts to save a failing carrier in bankruptcy from collapse." *Id.* at 169. ALPA further contends that even if the subsection does not specifically incorporate this holding, the standard for interim relief under § 1113(e) requires a showing that without such relief, the debtor will suffer immediate collapse.

Although the legislative history of § 1113(e) is not absolutely conclusive on the question of whether Congress intended to incorporate the *REA Express* standard into § 1113, it indicates at a minimum that Congress expected that the standard under § 1113(e) would closely resemble the *REA Express* standard. Representatives Morrison and Hughes stated in their report that "[t]he statutory language of subsection (e) stating the standard for qualifying for interim relief is, in essence, the REA Express standard." 130 Cong.Rec. H7471–7500 (June 29, 1984), reprinted in Appendix 4,

*Collier on Bankruptcy, supra,* XX–87. Senator Packwood, another sponsor of the law, stated with respect to § 1113(e), "[t]his provision essentially requires the court to apply the test used by the Second Circuit Court of Appeals in the *REA Express* case." *Id.* at XX–84. Representative Lundgren stated that while "I am not certain that I would like to define it totally as the REA standard ... it is narrowly defined." *Id.* at XX–35.

In addition, the Second Circuit has indicated that it views the standard for interim relief under § 1113(e) as substantially more burdensome than the standard for permanent rejection of a collective bargaining agreement. In *Truck Drivers Local 807, Int'l Bhd. of Teamsters v. Carey Transportation Inc., supra,* 816 F.2d at 89, the Court stated that "[i]n the interim relief context ... it is only proper that the court focus on the bare minimum requirements for short-term survival." While this statement is, as the Trustee points out, technically dicta, it indicates that the Court of Appeals views the standard for interim relief as placing a substantially higher burden on the debtor to show economic necessity for the requested changes than it would need to show in order to obtain permanent relief after following the procedural requirements of § 1113.

Here, it appears that the bankruptcy court applied the less stringent standard for permanent relief set forth in *Truck Drivers Local 807, Int'l Bhd. of Teamsters v. Carey Transportation Inc., supra,* 816 F.2d at 90:

> [T]he necessity requirement [for permanent relief from a collective bargaining agreement] places on the debtor the burden of proving that its proposal is made in good faith, and that it contains necessary, but not absolutely minimal, changes that will enable the debtor to complete the reorganization process successfully.

While the bankruptcy court's order states that the interim changes are necessary to avoid irreparable damage to the estate, Order at 4, the considerations on which this conclusion is based indicate that the bank-

ruptcy court was concerned with Eastern's ability to successfully reorganize in the long run, rather than with its ability to avoid imminent liquidation.

The bankruptcy court found that the interim wage, work rule and other changes to the CBA were "essential to the continuation of Eastern's business," and necessary to "avoid irreparable damage to Eastern's estate." Order at 4. In support of this finding, the bankruptcy court cited the Trustee's testimony that the changes to the CBA would save $30 million in 1990 and $66 million in 1991, thereby transforming a forecasted $26 million operating loss into a $41 million gain. Decision at 8. The bankruptcy court also pointed to the Trustee's testimony that the changes were necessary to develop confidence in Eastern's business on the part of the company's creditors and the public as supporting its finding.

While the bankruptcy court stated that "prompt cost reductions, including pilot labor cost reductions, are essential if an imminent liquidation of the estate is to be avoided," *id.* at 10, in summarizing the need for changes to the CBA, the bankruptcy court pointed to several long run considerations, such as the bargaining history of the parties and the need for Eastern to effect permanent cost reductions in order to successfully reorganize:

> Eastern's staggering loss of over 1.2 billion dollars in the first thirteen months after its petition was filed have made it abundantly clear that Eastern will be unable to successfully reorganize without significant reductions in its costs, including its labor costs. Although Eastern and ALPA have been in negotiations for over three years, the bargaining process has failed to yield the modification in the collective bargaining agreement that would allow Eastern to successfully reorganize, and therefore, Eastern's request for § 1113(e) relief is well founded and should be granted.

*Id.* at 9–10.

 In light of the foregoing discussion, the Court holds that the standard for interim relief under § 1113(e) requires a showing that the short term survival of the debtor is threatened unless immediate changes to the collective bargaining agreement are authorized. The bankruptcy court thus erred in taking into consideration the effects of interim relief on Eastern's long term prospects for reorganization when it authorized modifications to the CBA under § 1113(e).

### III. The Enjoining of the Florida Lawsuits

The second basis for ALPA's appeal is its challenge to the bankruptcy court's enjoining of the Florida lawsuits pursuant to § 105 of the Bankruptcy Code. ALPA initially contended that the injunctions were improper under both the Bankruptcy Code and the Norris–LaGuardia Act, 29 U.S.C. §§ 101–15.

### A. *The Bankruptcy Code*

This Court's determination as to whether the Florida lawsuits were properly enjoined under the Bankruptcy Code is controlled by the recent decision of the Second Circuit in *In re Ionosphere Clubs, Inc.*, 922 F.2d 984 (2d Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991). In that case, also an appeal arising out of the Eastern bankruptcy proceedings, ALPA challenged two orders of the bankruptcy court which denied relief from the automatic stay to initiate an arbitration and enjoined a lawsuit brought by the union seeking judicial enforcement of a provision of the CBA.

 The Second Circuit held that application of the automatic stay provisions of § 362 of the Bankruptcy Code is precluded by § 1113(f) when doing so would permit a debtor to terminate or alter a collective bargaining agreement unilaterally. *Id.* at 992. Applying this reasoning to the bankruptcy court's orders, the Court held first that application of the automatic stay to arbitration proceedings violated § 1113(f), since Eastern was thereby able to avoid the arbitration clause contained in the CBA. *Id.* at 993. With respect to the action brought to enforce the CBA, the Court held that the bankruptcy court ·may enjoin a non-bankruptcy judicial proceeding to en-

force a collective bargaining agreement under § 105 of the Bankruptcy Code only if the union can bring the dispute before the bankruptcy court and the bankruptcy court has jurisdiction to resolve it.[8] Since the bankruptcy court had jurisdiction to resolve the issues raised in the union's lawsuit, the Court held that § 1113(f) did not preclude a stay of that action or the bankruptcy court's injunction. *Id.* at 996. Finally, the Court held that if the bankruptcy court chooses to enjoin an action to enforce a collective bargaining agreement which is proceeding in another forum, § 1113(f) compels it to hear the dispute itself. *Id.* at 993.

In the present case, ALPA conceded at oral argument that according to the holding in *In re Ionosphere Clubs, Inc., supra,* 922 F.2d 984, the bankruptcy court's enjoining of the Florida Lawsuits is permitted under the Bankruptcy Code. ALPA points out, however, that under *Ionosphere,* the bankruptcy court is required to hear the disputes that are the subject of the Florida Lawsuits, and that the order on appeal here does not so provide.

## B. *The Norris–LaGuardia Act*

ALPA next contends that the Norris–LaGuardia Act prohibits the bankruptcy court from enjoining a lawsuit brought by a union to enforce its rights under a collective bargaining agreement.[9] In order to resolve this question the Court must consider the competing policy goals of the Norris–LaGuardia Act and the Bankruptcy Code.

The Norris–LaGuardia Act "expresses a basic policy against the injunction of activities of labor unions." *United Air Lines, Inc. v. Airline Division, Int'l Bhd. of Teamsters,* 874 F.2d 110, 112 (2d Cir.1989) (quoting *Int'l Ass'n of Machinists v. Street,* 367 U.S. 740, 772, 81 S.Ct. 1784, 1801, 6 L.Ed.2d 1141 (1961)). The Act deprives federal courts of jurisdiction to issue injunctions in any "case involving or growing out of a labor dispute," except in strict conformity with the Act's requirements. 29 U.S.C. § 101. These requirements include an absolute prohibition on the injunction of certain enumerated acts, *id.* at § 104, and the imposition of various substantive and procedural conditions on the availability of injunctive relief in all other cases. *Id.* at §§ 107–09.

Section 105 of the Bankruptcy Code empowers a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Like the automatic stay provision contained in § 362, § 105 allows the bankruptcy court to protect its jurisdiction over property of the debtor's estate. The Second Circuit has repeatedly emphasized the importance, in reorganization proceedings, of centralizing all matters affecting the debtor into one tribunal. *In re Ionosphere Clubs, Inc., supra,* 922 F.2d at 991; *Bohack Corp. v. Borden, Inc.,* 599 F.2d 1160, 1164 (2d Cir.1979). In reorganization, where the object is to revive a business rather than simply to liquidate its assets, the bankruptcy court must have unfettered jurisdiction in order to assure quick resolution of the proceedings. *Bohack Corp. v. Borden, Inc., supra,* 599 F.2d at 1164.

The Trustee argues that the Norris–LaGuardia Act is intended only to prevent federal courts from enjoining traditional economic weapons such as strikes, and thus does not affect the bankruptcy court's power to enjoin the Florida Lawsuits. In effect, the Trustee would limit the meaning of term "labor dispute," as employed in the Norris–LaGuardia Act, to economic self-help. The extraordinarily broad language of the Act undermines the Trustee's position, however. The Act defines the term "labor dispute" as including "any controversy concerning terms or con-

8. The bankruptcy court's exercise of its equitable powers to enjoin a lawsuit under § 105 of the Bankruptcy Code is subject to the same considerations as govern the application of the automatic stay with respect to efforts to enforce a collective bargaining agreement. *Id.* at 995.

9. In *In re Ionosphere Clubs, Inc., supra,* the Second Circuit declined to decide the effect of the Norris–LaGuardia Act on a bankruptcy court's ability to enjoin lawsuits brought by unions against employers. 922 F.2d at 996.

ditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." 29 U.S.C. § 113(c).

■ Despite the literal definition of "labor dispute," the Trustee maintains that the Norris–LaGuardia Act has no application with respect to activity that does not constitute some type of economic coercion. While some courts have accepted this narrowed definition, *see e.g., De Arroyo v. Sindicato de Trabajadores Packinghouse, AFL–CIO,* 425 F.2d 281, 290–91 (1st Cir.), *cert. denied sub nom. Puerto Rico Tel. Co. v. De Arroyo,* 400 U.S. 877, 91 S.Ct. 117, 27 L.Ed.2d 114 (1970), recent Supreme Court decisions have cast doubt on such an approach by reaffirming the broad reading to be given to the term "labor dispute." *Burlington Northern R.R. v. Bhd. of Maintenance of Way Employes,* 481 U.S. 429, 440–43, 107 S.Ct. 1841, 1848–50, 95 L.Ed.2d 381 (1987); *Jacksonville Bulk Terminals v. Int'l Longshoremen's Ass'n,* 457 U.S. 702, 709–10, 102 S.Ct. 2672, 2678–79, 73 L.Ed.2d 327 (1982). Indeed, a majority of the Courts of Appeals that have considered the question in recent years have held that the application of the Norris–LaGuardia Act is not limited to coercive economic activity. *Camping Constr. Co. v. Dist. Council of Iron Workers,* 915 F.2d 1333, 1342–43 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2260, 114 L.Ed.2d 713 (1991); *District 29, United Mine Workers of America v. New Beckley Mining Corp.,* 895 F.2d 942, 945 (4th Cir. 1990); *Marine Trans. Lines, Inc. v. Int'l Org. of Masters, Mates and Pilots,* 770 F.2d 1526, 1529 (11th Cir.1985), *cert. denied,* 475 U.S. 1108, 106 S.Ct. 1514, 89 L.Ed.2d 913 (1986); *In re Dist. No. 1– Pacific Coast Dist., Marine Eng'rs' Beneficial Ass'n,* 723 F.2d 70, 74 n. 2, 79–80 (D.C.Cir.1983). *But see Int'l Union, UAW v. Mack Trucks, Inc.,* 820 F.2d 91, 97 (3d Cir.1987). The Court therefore concludes that the Florida Lawsuits fall within the

definition of "labor dispute" as employed in the Norris–LaGuardia Act.

■ In spite of the seemingly absolute prohibition of the Norris–LaGuardia Act, the Supreme Court has held that federal courts may, under certain circumstances, issue injunctions in labor disputes. The strictures of the Act "must give way when necessary to enforce a duty specifically imposed by another statute," *Pittsburgh & Lake Erie R.R. Co. v. Railway Executives' Ass'n,* 491 U.S. 490, 514, 109 S.Ct. 2584, 2598, 105 L.Ed.2d 415 (1989), or to accommodate the strong federal policy favoring labor arbitration. *See, e.g., Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 249–53, 90 S.Ct. 1583, 1591–94, 26 L.Ed.2d 199 (1970). The Trustee argues that the bankruptcy court's enjoining of the Florida Lawsuits falls within an exception to the Norris–LaGuardia Act, because the injunctions were necessary to preserving the bankruptcy court's jurisdiction over Eastern's estate.

The Second Circuit has repeatedly held that the Norris–LaGuardia Act restricts the power of a bankruptcy court in reorganization proceedings. *Eastern Air Lines, Inc. v. Int'l Ass'n of Machinists and Aerospace Workers, AFL–CIO,* 923 F.2d 26 (2d Cir.1991), *aff'g* 121 B.R. 428 (S.D.N.Y. 1990); *In re Petrusch,* 667 F.2d 297, 299 (2d Cir.1981), *cert. denied,* 456 U.S. 974, 102 S.Ct. 2238, 72 L.Ed.2d 848 (1982); *Truck Drivers Local Union No. 807, Int'l Bhd. of Teamsters v. Bohack Corp.,* 541 F.2d 312, 318 (2d Cir.1976). None of these cases, however, involve the enjoining of lawsuits brought by a union to enforce the collective bargaining responsibilities of an employer. Unlike economic self-help, a lawsuit brought to enforce the obligations of a debtor with respect to a collective bargaining agreement implicates the ability of the bankruptcy court to maintain its jurisdiction over the debtor's estate.

In such a situation, the purposes of both the Bankruptcy Code and the Norris–LaGuardia Act can be accommodated by allowing the bankruptcy court to determine whether proceedings brought to enforce collective bargaining obligations should go

forward in the bankruptcy court rather than in another forum. Applying the rule announced in *In re Ionosphere Clubs, Inc., supra*, 922 F.2d 984, to cases involving the Norris–LaGuardia Act would accomplish this purpose. As described above, under the holding in *Ionosphere*, if a union has a procedural mechanism to place a dispute involving collective bargaining obligations before the bankruptcy court and the bankruptcy court has jurisdiction to resolve the dispute, the bankruptcy court may then either enjoin the proceeding in the non-bankruptcy forum and hear the dispute itself or allow the resolution of the dispute to proceed in the other forum. *Id.* at 993.

This rule creates only a limited exception to the strictures of the Norris–LaGuardia Act. Unlike the situation in which some form of economic self-help is enjoined, under the *Ionosphere* rule, the ultimate goal of the enjoined activity is not thwarted. If the bankruptcy court enjoins a union's lawsuit, the union may continue to seek judicial enforcement of the collective bargaining obligations of its employer, but is simply required to bring its enforcement proceeding in a forum other than the one it selected initially. This Court is of the view that such a limited exception is warranted by the strong policy embodied in the Bankruptcy Code favoring a bankruptcy court's ability to protect its jurisdiction over the debtor's estate.

Here, the parties are in agreement that the bankruptcy court's enjoining of the Florida Lawsuits was permitted under the *Ionosphere* rule. However, the bankruptcy court issued the injunctions solely as a means of protecting its ability to enforce the interim relief it granted under § 1113(e). Since the Court has held that this portion of the order was improperly granted, the best course with respect to the injunctions is to vacate them as well and allow the bankruptcy court to decide whether enjoining the Florida Lawsuits is now appropriate. In addition, as pointed out above, the order did not provide for the bankruptcy court to hear the disputes which are the subject of the Florida Lawsuits. Should the bankruptcy court decide in the future to enjoin the Florida Lawsuits, it would be required by the rule in *Ionosphere* to include such a provision.

## CONCLUSION

For the foregoing reasons, the order of the bankruptcy court is vacated and the matter is remanded for further proceedings consistent with this opinion.

It is so ordered.